# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 438 | **DATE** | 3/12/2003 |
| **CASE TITLE** | Taco Bell Corporation vs. Continental Casualty Co, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ☒ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Taco Bell's Motion for Partial Summary Judgment on the issue of Zurich's duty to defend Taco Bell in the Wrench litigation is GRANTED. Continental's Motion for Partial Summary Judgment on the issue of Zurich's reimbursement and equitable contribution obligations is GRANTED IN PART AND DENIED IN PART. Status hearing set for March 25, 2003 at 9:00 a.m.

(11) ☒ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | MAR 1 2 2003 | | 703 |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | | CLERK, U.S. DISTRICT COURT | date mailed notice | |
| WAP | courtroom deputy's initials | | 03 MAR 14 PM 2: 33 | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |



TACO BELL CORPORATION,
                Plaintiff,

     v.

CONTINENTAL CASUALTY COMPANY
and ZURICH AMERICAN INSURANCE
COMPANY,
                Defendants.

_____

CONTINENTAL CASUALTY COMPANY,
           Counter-Claimant,

     v.

TACO BELL CORPORATION,
           Counter-Defendant.

_____

CONTINENTAL CASUALTY COMPANY,
            Cross-Claimant,

     v.

ZURICH AMERICAN INSURANCE
COMPANY,
            Cross-Defendant.

_____

CONTINENTAL CASUALTY COMPANY,
      Third-Party Plaintiff,

     v.

ZURICH INSURANCE COMPANY,
      Third-Party Defendant.

Case No. 01 C 0438

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Taco Bell Corporation, a California corporation ("Taco Bell"), brings this one-count First Amended Complaint against Continental Casualty Company, an Illinois corporation

("Continental"), and Zurich American Insurance Company, a New York corporation ("Zurich" and, together with Continental, the "Defendants"), seeking a declaratory judgment that the Defendants have a duty to defend Taco Bell in connection with litigation currently pending in the Western District of Michigan under the caption *Wrench LLC v. Taco Bell Corp.*, No. 1-98-CV-45. Zurich has filed a counter-claim seeking a declaratory judgment that it has no duty to indemnify (and therefore no duty to defend) Taco Bell. Through cross-claims and a third-party complaint, Continental seeks either full reimbursement or equitable contribution from Zurich for any amounts that Continental has paid Taco Bell in connection with the defense of the *Wrench* litigation. Presently before the Court is (i) Taco Bell's Motion for Partial Summary Judgment on the issue of Zurich's duty to defend Taco Bell in *Wrench*, and (ii) Continental's Motion for Partial Summary Judgment on the issue of Zurich's reimbursement and equitable contribution obligations to Continental. For the following reasons, the Court grants Taco Bell's motion and grants in part and denies in part Continental's motion.

## I. BACKGROUND

### A. Underlying *Wrench* Litigation

The Plaintiffs in the underlying *Wrench* action (the "*Wrench* Plaintiffs") originally filed suit on January 16, 1998, alleging that Taco Bell had misappropriated (and threatened to continue to misappropriate) certain advertising ideas, concepts and images

related to a Chihuahua for use in a national advertising and licensing campaign. The *Wrench* Plaintiffs sought, among other remedies, a temporary restraining order ("TRO") against Taco Bell. The *Wrench* court refused to issue a TRO, and the *Wrench* Plaintiffs subsequently amended their complaint on July 16, 1998. In that first amended complaint, the *Wrench* Plaintiffs' misappropriation allegations are embodied in several particular causes of action, including breach of implied-in-fact contract, misappropriation, conversion, unfair competition under Michigan law, and unfair competition under California law. On June 10, 1999, the district court in *Wrench* granted summary judgment in favor of Taco Bell on all counts. *See Wrench v. Taco Bell Corp.*, 51 F.Supp.2d 840 (W.D. Mich. 1999). On appeal, the Sixth Circuit reversed and remanded and the case is now scheduled for trial.

The first amended complaint in *Wrench* sets forth the following specific allegations. In early 1995, the *Wrench* Plaintiffs developed a marketing design based on the idea of a "Psycho Chihuahua," described as a "clever, feisty Chihuahua dog with an attitude." (*Wrench* First Am. Compl. ¶ 7.) At a trade show in June 1996, the *Wrench* Plaintiffs were approached by representatives of Taco Bell who "expressed a keen interest in [the] Psycho Chihuahua" character. (*Id.* ¶ 13.) Throughout the summer and fall of 1996, the *Wrench* Plaintiffs "had numerous conversations with [Taco Bell representatives] regarding the Psycho Chihuahua character and how it might be used by Taco Bell." (*Id.* ¶ 15.) To this end, the

*Wrench* Plaintiffs created certain prototype designs adapting the Psycho Chihuahua idea "specifically for Taco Bell," an effort which included the production of story boards with advertising ideas. At a November 1996 meeting, agents of the *Wrench* Plaintiffs and Taco Bell "specifically discussed" the "broad, unique idea for an advertising campaign based on a Chihuahua with an attitude obsessed with Taco Bell food, describing the Chihuahua to be used in the campaign as edgy and feisty, with a spicy Mexican personality and an insatiable craving for Taco Bell food." (*Id.* ¶ 21.) Following this meeting, the *Wrench* Plaintiffs "continued to churn out ideas and materials utilizing [the] Chihuahua character to promote Taco Bell." (*Id.* ¶ 24.) These ideas became more concrete in February 1997, and included

> the concept of a boy dog ignoring a girl dog to get to Taco Bell food, the idea of a Chihuahua sneaking into a car to get Taco Bell food, the use of a bobbing head doll in the back of a car, the use of a Chihuahua head popping out of a circle at the end of a commercial, the use of computer graphic imaging to manipulate the live Chihuahua character, and the use of a consistent tag line at the end of every commercial to keep the Chihuahua as a consistent icon for Taco Bell.

(*Id.* ¶ 25.)

At the behest of Taco Bell, the *Wrench* Plaintiffs continued to refine the Psycho Chihuahua marketing concept through June 1997 and "put together more presentation materials, including the story boards, as well as designs for food containers, wrappers, uniforms,

and cups, presentation boards, toys, apparel, and the like."
(*Id.* ¶¶ 28, 32.) After not "hear[ing] back from Taco Bell for
several weeks," the *Wrench* Plaintiffs were "shocked" to discover a
*USA Today* article in late July 1997 describing "Taco Bell's new
$200 million advertising campaign. One of the commercials
mentioned in the article featured the use of a Chihuahua
character." (*Id.* ¶ 33.)

> Indeed, [b]eginning in the last week of July
> 1997, Taco Bell began airing three new
> Chiat/Day [Taco Bell's outside advertising
> agency] commercials, one of which featured a
> Chihuahua. The theme of that commercial was
> of a Chihuahua obsessed with the thought of
> Taco Bell food to the exclusion of anything
> else, including a female Chihuahua. The
> commercial used a live Chihuahua dog
> manipulated by computer graphic imaging.

(*Id.* ¶ 34.)

Based on the initial success of this commercial, Taco Bell
decided in "mid-October 1997" that "the Chihuahua would be the
focus of its 1998 marketing and licensing campaign. Five
additional Chihuahua spots were produced and, on December 29, 1997,
Taco Bell publicly announced its national marketing campaign
featuring a Chihuahua." (*Id.* ¶ 36.) This new "advertising
campaign based on the Chihuahua" was launched "within days of the
Super Bowl" in January 1998, and "Taco Bell has since aired
approximately a dozen commercials featuring the Chihuahua."
(*Id.* ¶ 37.)

Based on these events, the *Wrench* Plaintiffs filed the previously described lawsuit, claiming that

> Taco Bell's campaign is based on the same basic idea of a Chihuahua with an attitude that is obsessed with Taco Bell food. Taco Bell has also used several of the specific commercial ideas provided by plaintiffs in its campaign, including the idea of using a live dog manipulated by computer graphic imaging, the idea of having a boy Chihuahua passing up a girl Chihuahua for Taco Bell food, the idea of using a bobbing head doll in a commercial, the idea of having a Chihuahua sneaking into the rear window of a car to obtain Taco Bell food, the idea of a Chihuahua popping his head out through a hole at the end of a commercial, and the idea of using a consistent tag line at the end of every commercial to keep the Chihuahua as a consistent icon for Taco Bell.

(*Id.* ¶ 38.)

## B. Governing Primary Insurance Policies

During the relevant time period in *Wrench*, Taco Bell carried two consecutive primary commercial general liability policies. The first was issued by Continental (the "Continental Policy") and covered the time period January 1, 1997 through October 6, 1997 ("Policy Period 1"). The second was issued by Zurich (the "Zurich Policy") and spanned from October 7, 1997 through January 1, 1999 ("Policy Period 2"). Each of these primary policies insured Taco Bell against, inter alia, "advertising injury" liability and promised defense and indemnity against any claims by third parties alleging such injury.

Specifically, the Continental Policy provides: "We [Continental] will pay those sums that the insured becomes legally

obligated to pay as damages because of . . . 'advertising injury' to which this coverage part applies. We will have the right and duty to defend any 'suit' seeking those damages." (Continental Policy § I, Coverage B, ¶ 1.a.) The Continental Policy "applies" to any "'advertising injury' caused by an offense committed in the course of advertising [Taco Bell's] goods, products or services, but only if the offense was committed in the 'coverage territory' during the policy period." (*Id.* § I, Coverage B, ¶ 1.b(2).) The Continental Policy defines "advertising injury" as "injury arising out of one or more of the following offenses":

a.   Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b.   Oral or written publication of material that violates a person's right of privacy;

c.   Misappropriation of advertising ideas or style of doing business; or

d.   Infringement of copyright, title or slogan.

(*Id.* § V, ¶ 1.)

Using nearly identical language, the Zurich Policy provides: "We [Zurich] will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages." (Zurich Policy § I, Coverage B, ¶ 1.a.) The Zurich Policy "applies" to any "'advertising injury' caused by an offense

committed in paid announcements in the print or broadcast media in the course of advertising [Taco Bell's] goods, products or services, but only if the offense was committed in the 'coverage territory' during the policy period." (*Id.* § I, Coverage B, ¶ 1.b(2) and Endorsement 10.) The Zurich Policy defines "advertising injury" as "injury arising out of one or more of the following offenses":

- a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

- b. Oral or written publication of material that violates a person's right of privacy;

- c. Misappropriation of advertising ideas or style of doing business; or

- d. Infringement of copyright, title or slogan.

(*Id.* § V, ¶ 1 and Endorsement 10.)

The Zurich Policy specifically excludes coverage for any "'advertising injury' arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." (*Id.* § 1, Coverage B, ¶ 2.a(2).)

Unlike the Continental Policy, coverage under the Zurich Policy is not triggered until Taco Bell has paid a $2,000,000 self-insured retention ("SIR"), a type of deductible. (*Id.* Endorsement 2.) Taco Bell may exhaust this SIR by paying for either "'defense costs'" or "any final judgment or settlement" or both. (*Id.*) The SIR amount is "the most [Taco Bell] will pay for

- 8 -

all damages and 'defense costs' arising out of any one 'occurrence' or offense." (*Id.*) Once the SIR is exhausted, the Zurich Policy provides that Zurich "shall be liable only for the amount of damages and 'defense costs' in excess of the [SIR] amounts . . . up to the applicable Limits of Insurance shown in the Declarations of [the Zurich] policy." (*Id.*)

On or about March 10, 1998, Taco Bell provided notice of the *Wrench* action to the designated third-party administrator under the Zurich Policy, Gallagher Bassett Services, Inc. ("Gallagher Bassett"). On or about June 8, 1998, Taco Bell tendered the *Wrench* complaint directly to Zurich. In letters dated September 25, 1998 and November 4, 1998, Zurich denied owing any defense obligation to Taco Bell in connection with the *Wrench* action and expressly reserved its rights concerning payment of defense costs and/or any settlement or judgment. Zurich acknowledged that "the causes of action for misappropriation and unfair competition 'potentially' involve an advertising offense" but noted that, among other things, the Zurich Policy's prior publication exclusion, Taco Bell's failure to provide Zurich timely notice of the *Wrench* lawsuit, and the existence of the allegedly unexhausted SIR relieved it of any duty to defend. Zurich went further, and in December 1998 filed suit in the Superior Court for the State of California, County of Los Angeles (the "California Suit") seeking a declaratory judgment that it did not have a duty to defend Taco Bell in *Wrench*. On

April 15, 1999, the California state court stayed the California Suit pending final resolution of the *Wrench* action.

On June 10, 1998, Taco Bell notified Continental of the *Wrench* action. On September 4, 1998, Continental agreed to defend Taco Bell under a full reservation of rights, including the right to seek reimbursement or contribution from other insurance carriers and the right to withdraw from the defense. By October 1999, however, Continental had formed the view that "the *Wrench* action clearly did not seek damages caused by conduct that was covered under the [Continental Policy]." (Keith Decl. ¶ 7.) Continental ceased all payment of defense costs and forthwith filed a suit in federal court in Michigan seeking a declaratory judgment that it did not have a duty to defend Taco Bell. The Michigan suit was ultimately dismissed for lack of subject matter jurisdiction. *Continental Cas. Co. v. Taco Bell Corp.*, 127 F.Supp.2d 864, 871 (W.D. Mich. 2001).

On August 27, 2002, Taco Bell and Continental agreed to a confidential "conditional settlement" regarding Continental's defense obligations in *Wrench*, under which Continental

> has agreed to pay Taco Bell for a portion of
> *Wrench* related defense costs to the extent
> that they exceed $2 million, the amount of
> Taco Bell's SIR under the Zurich Policy, but
> has reserved the right to deny coverage and
> seek reimbursement from Zurich and/or Taco
> Bell depending on certain conditions. Taco
> Bell has similarly reserved its rights to
> pursue Continental for unpaid defense costs
> under certain conditions and both parties
> reserved rights as to the duty to indemnify

> should Taco Bell be found liable. Continental
> and Taco Bell, however, agree that Zurich has
> the duty to defend Taco Bell.

(Taco Bell Mem. in Supp. Mot. Summ J. at 6.) As of November 14, 2002, Continental had paid $3,310,256.20 relating to the defense of Taco Bell in *Wrench*, and continues to pay for a portion of those costs. (Keith Decl. ¶ 8.) As noted at the outset of this opinion, Continental has filed cross-claims and a third-party complaint seeking either full reimbursement or equitable contribution from Zurich for any amounts that Continental has paid Taco Bell in connection with the defense of the *Wrench* litigation.

### C. The Instant Action

On January 30, 2001, Taco Bell filed its First Amended Complaint (the "Complaint") against Continental and Zurich, seeking a declaratory judgment that each insurance carrier has a duty to defend Taco Bell in connection with the *Wrench* litigation. As originally filed, the Complaint contained four independent counts. On August 27, 2002, however, in conjunction with its conditional settlement with Continental, Taco Bell voluntarily dismissed Counts 1, 3 and 4 of the Complaint relating to Continental's alleged breach of its duty to defend. Count 2 of the Complaint, addressed to the Defendants' alleged duty to defend Taco Bell in *Wrench*, is therefore all that remains.

### II. SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Supreme Court has emphasized "that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue [of material fact] for trial." *Id.* at 249. In performing this task, all factual disputes are resolved, and all reasonable inferences are drawn, in favor of the nonmoving party. *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002). However, "[s]elf-serving assertions without factual support in the record will not defeat a motion for summary judgment." *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994).

The burden is initially upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the moving party believes demonstrate an absence of a genuine issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party may not rest upon the mere allegations

contained in the nonmoving party's pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989). Accordingly, summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. In such a situation, there can be "'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

### III. DISCUSSION

#### A. Duty to Defend Legal Standards

Under Illinois law, determining whether an insurer's duty to defend has arisen requires a court simply to "compare the allegations of the underlying complaint to the policy language. If the court determines that these allegations fall within, or *potentially within,* the policy's coverage, the insurer has a duty to defend the insured against the underlying complaint." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 607 N.E.2d 1204, 1220 (Ill. 1992) (emphasis in original); *see also U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.,* 578 N.E.2d 926, 930 (Ill. 1991)("If the

underlying complaints allege facts within or potentially within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent."). "An insurer may not justifiably refuse to defend an action against its insured unless it is *clear* from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." *Wilkin Insulation Co.*, 578 N.E.2d at 930 (Ill. 1991) (emphasis in original). The Court must construe the allegations of the underlying complaint liberally and must resolve all doubts in favor of the insured. *U.S. Fire Ins. Co. v. Aetna Life and Cas.*, 684 N.E.2d 956, 960 (Ill. App. 1997). "Moreover, if the underlying complaint[] allege[s] several theories of recovery against the insured, the duty to defend arises even if only one such theory is within the potential coverage of the policy." *Id.*

As with any contract, "[t]he construction of an insurance policy's provisions is a question of law" and the Court "must ascertain the intent of the parties to the contract." *Outboard Marine Corp.*, 607 N.E.2d at 1212.

> To ascertain the meaning of the policy's words and the intent of the parties, the court must construe the policy as a whole, with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract. If the words in the policy are unambiguous, a court must afford them their plain, ordinary, and popular meaning. However, if the words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous and will be

> construed in favor of the insured and against
> the insurer who drafted the policy.

*Outboard Marine Corp.*, 607 N.E.2d at 1212 (citations omitted). "[I]nsurance contract terms are given broad, inclusive definitions under Illinois law." *Knoll Pharm. Co. v. Auto. Ins. Co.*, 152 F.Supp.2d 1026, 1035 (N.D. Ill. 2001). Indeed, "[t]he law accords the insured most favorable and liberal construction of exclusionary insurance provisions and the underlying complaint. Insurance provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer." *U.S. Fire Ins. Co.*, 684 N.E.2d at 960.

## B. Zurich's Duty to Defend

Measured against these legal standards, it is clear that the allegations of the *Wrench* complaint fall "within, or potentially within," the Zurich Policy's coverage. The Zurich Policy was in force from October 7, 1997 to January 1, 1999 and covers losses resulting from "advertising injury," defined to include "[m]isappropriation of advertising ideas or style of doing business." (Zurich Policy § V, ¶ 1 and Endorsement 10.) "Many courts have construed the terms 'misappropriation of advertising idea' and 'misappropriation of the style of doing business' to mean, generally, a wrongful taking of the way another promotes its business . . . ." *Flodine v. State Farm Ins. Co.*, 2001 WL 204786, at *7 (N.D. Ill. March 1, 2001). The *Wrench* complaint claims that Taco Bell wrongfully used the "Psycho Chihuahua" concept in a

national advertising and licensing campaign that included, among other things, at least "a dozen" television commercials that were aired throughout 1998. The alleged offenses were "committed in paid announcements in the print or broadcast media in the course of advertising" Taco Bell's goods, products or services, and there is no dispute that these offenses were "committed in the 'coverage territory' during the [Zurich Policy] period." (*Id.* § I, Coverage B, ¶ 1.b(2) and Endorsement 10.)

Zurich claims, however, that three separate provisions of the Zurich Policy foreclose any possible duty to defend: the prior publication exclusion, the notice provision, and the SIR. The Court will address each *seriatim*.

### 1. Prior Publication Exclusion

As previously discussed, the Zurich Policy's prior publication exclusion (the "PP Exclusion") eliminates coverage for any "'advertising injury' arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." (*Id.* § I, ¶ 2.a(2).) Zurich claims that the PP Exclusion has been triggered because one of Taco Bell's commercials incorporating the "Psycho Chihuahua" character aired during the last week of July 1997, prior to the inception of Policy Period 2. Before addressing this argument head-on, the Court pauses briefly to acknowledge, and to reject unequivocally, Taco Bell's suggestion that the PP Exclusion does not extend to misappropriation claims at all in the Zurich Policy. Taco Bell,

relying on cases like *Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.*, 165 F.Supp.2d 1332, 1342 (S.D. Fla. 2001) and *Irons Home Builders, Inc. v. Auto-Owners Ins. Co.*, 839 F.Supp. 1260, 1266 (E.D. Mich. 1993), bases its suggestion on the existence of certain symmetries between the syntax in the PP Exclusion and the syntax in the definition of "advertising injury." The Court declines to follow the hermeneutic conclusions reached by the courts in *Adolfo* and *Irons Home Builders*, and instead adopts the sounder reasoning on this topic contained in *Applied Bolting Tech. Prods., Inc. v. U.S. Fid. & Guar. Co.*, 942 F.Supp. 1029, 1037 (E.D. Pa. 1996). In short, the Court holds that the PP Exclusion applies to all definitional subparts of "advertising injury" in the Zurich Policy. Discussion on this point need not proceed further than this, however, as the Court nonetheless holds that the PP Exclusion does not relieve Zurich of its duty to defend Taco Bell.

As noted above, Zurich contends that the PP Exclusion has been triggered because Taco Bell aired a single Chihuahua-themed commercial prior to the start of Policy Period 2. Zurich's position is meritless. For Zurich's argument to hold, the word "material" would have to be construed to mean something close to "advertising campaign theme." On this interpretation, the PP Exclusion would operate as a bar to coverage if the "Psycho Chihuahua" character was used in any commercial that aired before the commencement of Policy Period 2. This is neither the natural, nor certainly an appropriately liberal, *see U.S. Fire Ins. Co.*, 684

- 17 -

N.E.2d at 960 ("Insurance provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer."), interpretation of the PP Exclusion's language. Rather, the word "material" is best read to refer to a *particular* commercial instantiating the "Psycho Chihuahua" character. *Cf. Outboard Marine Corp.*, 607 N.E.2d at 1212 (Courts are to construe terms of an insurance policy "in favor of the insured and against the insurer who drafted the policy.").

In *International Communications Materials, Inc. v. Employer's Insurance of Wausau*, 1996 WL 1044552 (W.D. Pa. May 29, 1996), one of our sister courts confronted a very similar situation. In that case, the defendant had urged the court to read a nearly identical prior publication exclusion provision as encompassing the entire "theme" of plaintiff's advertising campaign. According to the defendant, the central "theme" of this campaign had been to "falsely identif[y] Ricoh's products as Japanese and . . . [to] misrepresent[] that [the plaintiff's] products were 'proven superior' to Ricoh's products." *Id.* at *4. The defendant pressed this interpretation even though the objectionable advertising material "may have continued over a period of time, in different forms and in connection with various Ricoh [products]." *Id.* The court flatly rejected the defendant's proposed construction, noting that "[i]f Wausau had intended that the exclusion apply to advertising campaigns or material that is 'similar to' material published before the inception of the policies, it could have

provided such language." *Id.* The court made specific reference to a distinguishable case in which a prior publication exclusion had precluded coverage for an advertising injury "if the first injurious publication or utterance of the *same or similar* material was made prior to the effective date of this insurance." *See Forum Ins. Co. v. Ranger Ins. Co.*, 1992 U.S. Dist. LEXIS 11360, at *40-41 (N.D. Ill. July 27, 1992) (emphasis supplied). Based on the plain language of the prior publication exclusion under consideration in *International Communication Materials*, the court held that it "does not preclude coverage for material published within the policy period, even if similar to previously published material, or if part of an 'advertising campaign.'" *Int'l Comm. Materials, Inc.*, 1996 WL 1044552, at *4.

Likewise in the instant case. Although the overall "theme" of Taco Bell's advertising campaign revolved around the "Psycho Chihuahua" mascot, the Court holds that the relevant "material" subject to the PP Exclusion in any given case will consist of a *particular* Chihuahua-themed commercial produced under the direction of, and aired by, Taco Bell. This conclusion is bolstered by the *Wrench* complaint itself, which takes pains to describe a wide variety of specific advertising ideas and concepts utilizing the "Psycho Chihuahua" character, including

> the idea of using a live dog manipulated by computer graphic imaging, the idea of having a boy Chihuahua passing up a girl Chihuahua for Taco Bell food, the idea of using a bobbing head doll in a commercial, the idea of having

> a Chihuahua sneaking into the rear window of a
> car to obtain Taco Bell food, the idea of a
> Chihuahua popping his head out through a hole
> at the end of a commercial, and the idea of
> using a consistent tag line at the end of
> every commercial to keep the Chihuahua as a
> consistent icon for Taco Bell.

(Compl. ¶ 38.) The *Wrench* Plaintiffs' creative energies were not simply devoted to the abstract concept or theme of a "Psycho Chihuahua," they were rather directed at generating specific, marketable advertising ideas that incorporated it.

All the *Wrench* complaint reveals is that, prior to Policy Period 2, Taco Bell aired a single commercial utilizing two of the six advertising ideas enumerated above, namely, the idea of "a Chihuahua obsessed with the thought of Taco Bell food to the exclusion of anything else, including a female Chihuahua" and the idea of "a live Chihuahua dog manipulated by computer graphic imaging." (Compl. ¶ 34.) By deduction, then, the content of at least some of the "dozen" other offending commercials that Taco Bell allegedly ran during Policy Period 2 must have been based on designs and ideas different from those in the initial commercial, and would therefore constitute distinguishable "material" for purposes of the PP Exclusion.

Based on the Court's construction of the PP Exclusion, Zurich could only take refuge in it if the *Wrench* complaint unambiguously alleged that *all* of the offending Chihuahua-themed commercials were first published prior to the inception of the Zurich Policy. *Cf. Guardian Trust Co. v. Am. States Ins. Co.*, 1996 WL 509638, at *10

(D. Kan. July 30, 1996)("For as long as the application of this [prior publication] exclusion remains simply a possibility, the insurer has a duty to defend."). This is of course not the case. Accordingly, the PP Exclusion offers Zurich no relief from its duty to defend Taco Bell in *Wrench*.

### 2. Notice

Zurich next argues that it has no duty to defend because Taco Bell "failed to comply with the notice provision contained in the Zurich Policy." (Zurich Resp. to Taco Bell Mot. Summ. J. at 18.) The relevant notice provision requires "[Taco Bell] or the authorized claim service provider" to "notify [Zurich] promptly of an 'occurrence' or offense which may result in a claim under th[e] [Zurich] policy." (Zurich Policy Endorsement 2.)

In Illinois, it is true that if an "insured fails to comply with a notice provision, the insurer will be relieved from its duties to defend and indemnify under the policy." *Northbrook Prop. & Cas. Ins. Co. v. Applied Sys., Inc.*, 729 N.E.2d 915, 920-21 (Ill. App. 2000). After all, a "notice of suit provision in an insurance liability policy is not a mere technical requirement for the convenience of the insurer, but is a valid condition precedent to the triggering of the insurer's contractual duties." *Id.* Generally, however, "the time within which notice is required is determined by a standard of reasonableness, based upon the facts and circumstances of a particular case." *U.S. Fid. & Guar. Co. v. Maren Eng'g Corp.*, 403 N.E.2d 508, 511 (Ill. App. 1980); *see also*

*Barrington Consol. High Sch. v. Am. Ins. Co.*, 319 N.E.2d 25, 27 (Ill. 1974)("Provisions in policies stating when the insurer must be notified of a covered occurrence have generally been interpreted to require notification of the company within a reasonable time, considering all the facts and circumstances of the particular case."). Factors to be considered in determining reasonableness "include length of time between service and giving notice and whether the insurer was prejudiced by reason of delay." *Attorneys' Title Guar. Fund, Inc. v. Maryland Cas. Co.*, 1991 WL 171339, at *8 n.6 (N.D. Ill. Aug. 23, 1991); *see also Am. Home Assur. Co. v. Granite City*, 375 N.E.2d 969, 972 (Ill. App. 1978).

The material facts on this point are not in dispute. Taco Bell provided notice of the *Wrench* lawsuit (a case which is now over five years old) to Gallagher Basset, the third party administrator and authorized claim service provider under the Zurich Policy, on or about March 10, 1998, roughly two months after it was filed. Taco Bell tendered the *Wrench* complaint directly to Zurich on June 8, 1998, roughly four-and-a-half months after it was filed. There is some wrangling in the briefs over whether or not Taco Bell's notice to Gallagher Bassett constituted notice to Zurich as required under the terms of the Zurich Policy, but the Court need not reach that question. The Court holds that Taco Bell's notice directly to Zurich on June 8, 1998 was sufficiently "prompt" (*i.e.*, reasonable under the facts and circumstances of this case).

Taco Bell can hardly be accused of bad faith, lack of
diligence or otherwise inexcusable delay, especially considering
that Zurich's defense obligations under the Zurich Policy do not
even activate until the $2,000,000 SIR is duly exhausted. *See
First State Ins. Co. v. Montgomery Ward & Co., Inc.*, 642 N.E.2d
715, 718 (Ill. App. 1994). Taco Bell took indisputably prompt
steps to notify Gallagher Bassett of the *Wrench* action, and there
is not the slightest hint that the three extra months that elapsed
before Taco Bell tendered the *Wrench* complaint directly to Zurich
prejudiced Zurich in any way. *Cf. Ill. Valley Minerals Corp. v.
Royal-Globe Ins. Co.*, 388 N.E.2d 253, 256 (Ill. App. 1979)(six-
month delay in giving notice held unreasonable where insurer was
entirely "deprived of any opportunity to make a timely and thorough
investigation of the claim"); *Applied Sys., Inc.*, 729 N.E.2d at 924
(seventeen-month delay in providing notice held unreasonable where
insurer "was precluded from being able to meaningfully participate
in the pretrial discovery occurring prior to Applied's
notification, which the record reveals to have been substantial").

Zurich notes that, under the Zurich Policy, it "shall not be
required to establish prejudice resulting from . . . noncompliance"
with the notice provision. But this has no bearing on the present
discussion, as the Court concludes that Taco Bell *did* comply with
the notice strictures of the Zurich Policy. In any event,
regardless whether Zurich carries a contractual burden
affirmatively to demonstrate prejudice, the Court always remains

free to consider the manifest *absence* of prejudice in its analysis of reasonableness of notice. *Applied Systems, Inc.*, 729 N.E.2d at 922 ("The general rule in notice cases is that the insurer need not prove prejudice, since the controlling issue is not whether the insurer's interests have been compromised by the insured's inaction but only whether reasonable notice has been given. Prejudice is merely a factor in assessing the reasonableness of the notice." (citations omitted)). Considering all the facts and circumstances of this case, the Court holds that Taco Bell furnished Zurich with reasonable notice of the *Wrench* action.

### 3. Self-Insured Retention

As explained previously, Taco Bell's exhaustion of the $2,000,000 SIR is a condition precedent to coverage under the Zurich Policy. Taco Bell bears the burden of proof on this issue. *See* Lee R. Russ & Thomas F. Segalla, 17 *Couch on Insurance* § 254:93 (3d ed. 2000) [hereinafter *Couch on Insurance*] ("[W]here a given contract requirement is viewed as a condition precedent, the burden of showing compliance is generally placed on the insured . . . ."); *cf. Household Int'l, Inc. v. Liberty Mut. Ins. Co.*, 749 N.E.2d 1, 13 (Ill. App. 2001)(observing that "[n]otice is a condition precedent to coverage" and holding that "the insured bears the burden of proving its entitlement to coverage").

The SIR may be depleted by Taco Bell's payment of "defense costs," which include all "legal expenses, expert and other witness expenses, court costs, bond premiums and such other ususal and

incidental expenses attendant with claim and litigation costs," but exclude "fees, charges and costs of the claim service provider." (Zurich Policy Endorsement 2.) The SIR amount is "the most [Taco Bell] will pay for all damages and 'defense costs' arising out of any one 'occurrence' or offense." (*Id.*) Once the SIR is exhausted, Zurich is "liable . . . . for the amount of damages and 'defense costs' in excess of the [SIR] amounts . . . up to the applicable Limits of Insurance shown in the Declarations of [the Zurich] policy." (*Id.*) Taco Bell asserts, and Continental agrees, that Taco Bell "has incurred over $5 million in defense costs in the *Wrench* case" and that it "has paid over $2 million of these defense costs on its own, well over the $2 million SIR . . . ." (Taco Bell Mot. Summ. J. at 3-4.) Taco Bell has submitted the declaration of Cynthia Nichols, associate manager of Taco Bell's litigation department, substantiating the fact that it has paid "on its own" at least $2,000,000 of the "well over $5 million in defense costs and fees Taco Bell has incurred to date." (Nichols Decl. ¶ 3.)

Zurich does not contest that Taco Bell has spent in excess of $2,000,000 defending the *Wrench* litigation. Rather, Zurich argues that Taco Bell has failed to "produce[] any evidence that it has exhausted the SIR through the payment of *reasonable* defense fees" or that any such payments relate "to claims that are at least potentially covered under the Zurich Policy." (Zurich Resp. to

Taco Bell Mot. Summ. J. at 21 (emphasis supplied).)  The Court will
consider each objection in turn.

### a. "Reasonable" Defense Costs

None of the parties dispute that only "commercially
reasonable" defense costs are recoverable under the Zurich Policy
and, by extension, that only the payment of such costs should count
against the $2,000,000 SIR.  The sole dispute on this point is how
commercial reasonableness is to be measured.  Zurich has submitted
under seal an excruciatingly detailed Legal Fee Review and Report
("Report") prepared by an outside consultant which, based on
"certain" of Taco Bell's legal expense invoices generated in
connection with the *Wrench* litigation, concludes that Taco Bell's
defense costs to this point have been, "in substantial part,
excessive, unreasonable, and unwarranted."  Put more simply,
according to the Report, Taco Bell has not yet paid "reasonable"
defense costs above the $2,000,000 SIR.

The failing of the Report is that it attempts to carry out the
"reasonableness" inquiry by scrutinizing each submitted invoice on
a line-by-line, entry-by-entry basis.  Review at that level of
granularity is not appropriate.  Moreover, the Report's conclusion
is irretrievably undermined by the fact that Taco Bell paid the
defense costs in *Wrench* during a time when both Zurich and
Continental were vigorously denying all liability under their
respective policies.  Under such conditions, any future recoupment
by Taco Bell of its defense outlays would have been speculative at

best, a fact that, as will be presently discussed, convincingly indicates the commercial reasonableness of those defense payments.

Useful guidance can be drawn from cases addressing issues related to contractual awards of attorney's fees. As Judge Castillo recently observed, "the Seventh Circuit has limited the scope of a court's inquiry regarding the award of attorney's fees pursuant to a private contract." *Knoll Pharm. Co. v. Auto. Ins. Co.*, 210 F.Supp.2d 1017, 1024 (N.D. Ill. 2002) (*"Knoll II"*) (*citing Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518 (7th Cir. 1999) and *Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150 (7th Cir. 1996)). In *Medcom*, the Seventh Circuit, reviewing certain legal bills the plaintiff had incurred "in the ordinary course of its business," stated that "[i]f the bills were paid, this strongly implies that they meet market standards." *Medcom*, 200 F.3d at 520. After all, the court noted, "[t]he fees in dispute . . . are not pie-in-the-sky numbers that one litigant seeks to collect from a stranger but would never dream of paying itself. These are bills that [the plaintiff] actually paid." *Medcom Holding Co.*, 200 F.3d at 520. Given the compelling indicia of reasonableness under these circumstances, the Seventh Circuit expressly disapproved "doing a detailed, hour-by-hour review after the fashion of a fee-shifting statute," indicating instead that district courts are best restricted to an "overview" of a litigant's "aggregate costs to ensure that they

were reasonable in relation to the stakes of the case and [the] litigation strategy." *Medcom Holding Co.*, 200 F.3d 518 at 521.

Likewise in *Balcor*, the Seventh Circuit held that "the best evidence of the market value of legal services is what people pay for it. Indeed, this is not 'evidence' about market value; it is market value. Although courts interpolate the word 'reasonable' into clauses of this kind, the best guarantee of reasonableness is willingness to pay." *Balcor Real Estate Holdings, Inc.*, 73 F.3d at 153. Reasonableness is indicated all the more when a party has "paid all of [its] bills at a time when its ultimate recovery was uncertain." *Medcom Holding Co.*, 200 F.3d at 521.

Restricting itself to an appropriate "overview," *Medcom Holding Co.*, 200 F.3d 518 at 521, of the reported defense costs in this case, and with both due regard for the fact that many of those costs were paid at a time when their ultimate "recovery was uncertain," *id.*, and due deference to Taco Bell's choice of litigation strategy in this "hard-fought, high-stakes" case, *cf. Amin v. Refco, Inc.*, 2001 WL 869626, at *8 (N.D. Ill. Aug. 1, 2001)(expressing reluctance to gainsay party's litigation tactics in context of fee request), the Court holds that Taco Bell has, as of November 21, 2002, paid at least $2,000,000 in reasonable defense costs related to the *Wrench* lawsuit. Indeed, given the Seventh Circuit's guidance in *Medcom* and *Balcor*, and Judge Castillo's treatment of similar issues in *Knoll II*, nothing

contained in Zurich's Report could convince a reasonable jury otherwise.

### b. *Relation of Defense Costs to Potentially Covered Claims*

Relying on *Buss v. Superior Court*, 939 P.2d 766 (Cal. 1997), Zurich further argues that monies spent by Taco Bell in defending the *Wrench* action should only count against the SIR if those expenditures are traceable to claims that are potentially covered under the Zurich Policy. The Court disagrees. In relevant part, the California Supreme Court in *Buss* held that an insurer that has mounted and funded a defense on behalf of an insured may, if it has properly reserved its rights, seek reimbursement for defense costs as to claims that are not even potentially covered under the governing policy. *Id.* at 775, 784 n.24. (It is worth noting here that in *Grinnell Mut. Reinsurance Co. v. Shierk*, 996 F.Supp. 836 (S.D. Ill. 1998), one of our sister courts in the Seventh Circuit predicted that the Illinois Supreme Court would adopt this holding of *Buss*.) In reaching that holding, the *Buss* court stopped to reaffirm the fundamental principle that an insurer owes a full duty of defense even in "mixed" cases that present claims "that are at least potentially covered and also those that are not." *Buss*, 939 P.2d at 782. Indeed, an insurer must defend such a case "in its entirety." *Id.*

Under Illinois law, it is well-established that if a complaint contains allegations that fall within, or potentially within, an insurance policy's coverage, the insurer has a duty to defend.

*Outboard Marine Corp.*, 607 N.E.2d at 1220.  Just as in California, see *Buss*, 939 P.2d at 782, that duty is no less robust where a complaint asserts several theories of recovery against the insured, only some of which fall within the potential coverage of the policy.  *U.S. Fire Ins. Co.*, 684 N.E.2d at 960; *Roman Catholic Diocese of Springfield v. Md. Cas. Co.*, 139 F.3d 561, 565 (7th Cir. 1998) ("[T]he possibility that not all of the injuries complained of in the complaint may be covered does not obviate the duty to defend; so long as at least some injuries potentially fall within the scope of the policy, the insurer must defend the insured.").  Even in that case, "the duty to defend arises."  *U.S. Fire Ins. Co.*, 684 N.E.2d at 960.

Given the expansive reach of an insurer's duty to defend in Illinois, and the guiding precept that "[i]nsurance provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer," *id.*, the Court holds that the Zurich Policy's SIR is subject to exhaustion by <u>any</u> commercially reasonable "defense costs" (as defined in the Zurich Policy) expended by Taco Bell in defending the *Wrench* lawsuit, without regard to whether those costs are traceable to potentially covered claims.

### C. Allocation of Defense Costs

Given that Zurich has a duty to defend Taco Bell, Continental, citing the doctrine of equitable subrogation, argues that it is entitled to "full reimbursement" from Zurich for all amounts it has

paid in connection with Taco Bell's defense of the *Wrench* action. This argument, however, rests on the false premise that Continental has no duty to defend Taco Bell. The *Wrench* complaint is clearly seeking damages for, among other things, advertising injury that arose from the publication of certain material during Policy Period 1 (*i.e.*, the July 1997 commercial featuring a Chihuahua). (Compl. ¶ 34.) It is undisputed that the Continental Policy provides coverage for suits seeking damages arising from advertising injury. (Continental Policy § I, Coverage B, ¶ 1.a.) There can be no doubt, therefore, that Continental has a duty to defend. Accordingly, to the extent that Continental's Partial Motion for Summary Judgment seeks a declaration that it does not have a duty to defend Taco Bell in *Wrench*, it is denied.

But then Zurich also has a duty to defend Taco Bell, so the question remains how best to allocate defense costs between each insurer. Continental favors the "pro rata, time-on-the-risk" theory, whereby each insurer would be accountable for defense costs based on the amount of time that its policy insured Taco Bell. *See, e.g., Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 670 N.E.2d 740, 749 (Ill. App. 1996); *see also Maremont Corp. v. Cont'l Cas. Co.*, 760 N.E.2d 550, 555 (Ill. App. 2001)(collecting cases). The time-on-the-risk apportionment technique was originally "developed as a solution for the problem of toxic torts and industrial diseases, where damage – and liability – may be found to span the term of several policies of insurance." 15 *Couch on*

*Insurance* § 217:9. In "these types of cases it is virtually impossible to allocate to each policy the liability for injuries occurring only within its policy period." *Id.* § 220:25. Courts solved this "nettlesome problem of how to allocate damages among the policies" by utilizing a pro rata, time-on-the-risk approach in such cases. *Id.*

This apportionment method is only appropriate, however, where "a single continuous occurrence results in an unallocable loss implicating successive policy periods." *Mo. Pac. R.R. Co. v. Int'l Ins. Co.*, 679 N.E.2d 801, 808 (Ill. App. 1997); *cf. Knoll II*, 210 F.Supp.2d at 1027 ("If damages can be allocated to a particular policy period, they should be applied this way; if not, however, the trial court should apply a pro-rata, time-on-the-risk allocation of damages."). Whether any given loss is allocable to a particular policy period is a key factual question that, in nearly all conceivable cases, must be resolved at trial (or through some other mechanism resulting in a final disposition of the matter). This explains why cases resorting to a "pro rata, time-on-the-risk" methodology have only done so once a case has concluded and it has been determined impossible precisely to apportion an overall damage award among multiple policy periods. Such an approach is simply malapropos in a declaratory judgment case which seeks a *prospective* determination of the allocation of defense costs.

Under the circumstances of the case at bar, the Court holds that the proper method for allocating defense costs is to be found in the "other insurance" clauses included in each of the Zurich and Continental policies. As explained by Couch,

> [m]ost liability insurance policies contain 'other insurance' clauses that attempt to limit the insurer's liability where other insurance covers the same risk. Such clauses attempt to control the manner in which each insurer contributes to or shares a covered loss. . . . Where such clauses are in effect, each insurer's ultimate liability is generally determined by the explicit provisions of the respective "other insurance" clauses.

15 *Couch on Insurance* § 218:5; 219:1 (internal quotation marks omitted).

Both the Zurich and Continental policies contain what is known as an "excess" other insurance clause according to which the "insurer will pay a loss only after other available primary insurance is exhausted." 15 *Couch on Insurance* § 219:5; 219:33. The Continental Policy is to be considered excess "with respect to losses . . . for which [Taco Bell] ha[s] other valid and collectible insurance, whether on a primary, excess or contingent basis . . .." (Continental Policy § IV, ¶ 4.a and Endorsement 20.) The Zurich Policy likewise provides, in pertinent part, that "[i]f other valid and collectible insurance is available to the insured covering a loss also covered by this policy, this insurance shall not contribute with but shall be in excess of any such other insurance . . .." (Zurich Policy § IV, ¶ 4.a and Endorsement 21.)

By their terms, then, each policy purports to cover Taco Bell's defense costs in *Wrench* solely on an excess basis. In such a situation, the governing "other insurance" provisions are rendered "irreconcilable, cancelling each provision and forcing the insurers to divide the liability equally between themselves." *Cont'l Nat'l Am. Ins. Co. v. Aetna Life and Cas. Co.*, 542 N.E.2d 954, 958 (Ill. App. 1989); *see also N. Am. Specialty Ins. Co. v. Liberty Mut. Ins. Co.*, 697 N.E.2d 347, 349 (Ill. App. 1998)("Two insurers, both having mutually repugnant 'other insurance' clauses establishing 'excess' coverage, must divide the liability equally where neither policy specifies the method of apportionment."). This result is consonant with the "Method of Sharing" clauses in each policy, which, using identical language, provide: "If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first." (Continental Policy § IV, ¶ 4.c; Zurich Policy § IV, ¶ 4.c.)

Accordingly, the Court holds that Zurich and Continental shall each bear fifty percent (50%) of Taco Bell's commercially reasonable defense costs in the *Wrench* litigation to the extent that such costs exceed the $2,000,000 SIR. Relatedly, the Court holds that Continental is immediately entitled to equitable contribution from Zurich in an amount equal to fifty percent (50%) of all commercially reasonable defense costs previously paid by

Continental on behalf of Taco Bell in the *Wrench* litigation to the extent that such payments exceed the $2,000,000 SIR. *See* 17 *Couch on Insurance* § 217:12 ("Where the insurers were equally obligated to defend the same insured, the insurer which undertook the defense may obtain contribution for the costs thereof from the other insurer."); *id.* § 217:4 ("The right of contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation."); *Pekin Ins. Co. v. Cincinnati Ins. Co.*, 510 N.E.2d 524, 526 (Ill. App. 1987)("Contribution is an equitable principle arising among coinsurers which permits one who has paid the entire loss to receive reimbursement from the other insurer liable for the loss.").

## IV. CONCLUSION

For the foregoing reasons, (i) Taco Bell's Motion for Partial Summary Judgment on the issue of Zurich's duty to defend Taco Bell in the *Wrench* litigation is **GRANTED,** and (ii) Continental's Motion for Partial Summary Judgment on the issue of Zurich's reimbursement and equitable contribution obligations is **GRANTED IN PART AND DENIED IN PART** The Court hereby declares as follows:

(1) Zurich and Continental each have a present duty to defend Taco Bell in connection with litigation currently pending in the Western District of Michigan under the caption *Wrench LLC v. Taco Bell Corp.*, No. 1-98-CV-45.

(2) Zurich and Continental shall each bear fifty percent (50%) of Taco Bell's commercially reasonable defense costs in the *Wrench* litigation to the extent that such costs exceed the $2,000,000 Self-Insured Retention in the Zurich Policy.

(3) Continental is immediately entitled to equitable contribution from Zurich in an amount equal to fifty percent (50%) of all commercially reasonable defense costs previously paid by Continental on behalf of Taco Bell in the *Wrench* litigation to the extent that such payments exceed the $2,000,000 Self-Insured Retention in the Zurich Policy.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: *March 12 2003*